UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:

| | |
|---|---|
| Monthly payments the International Regional Center, LLC (IRC), is obligated to make to The Cleveland Group, Ltd., under a promissory note dated February 12, 2012 | CASE NOS: 5:12MJ1029<br>5:12MJ1018<br>5:12MJ1019 |
| Certain payments Flats East Development, LLC (Flats East) is obligated to make to the Cleveland International Fund, Ltd. (CIF) Pursuant to an amended credit agreement | JUDGE JOHN ADAMS |
| Monthly (interest) payments University Hospital Health Systems, Inc. (UH) is Obligated to make to the Cleveland International Fund, Ltd. (CIF) on certain promissory notes for terms not to exceed 60 months | **ORDER** |

Pending before the Court is a motion to vacate filed in each of the case numbers detailed above. Before addressing the motion, the Court will detail how the current situation came to be, and the Court will then examine the propriety of the motion to vacate.

**Background**

On February 24, 2012, the Government applied for seizure warrants in 5:12MJ1018 and 5:12MJ1019. In seeking these warrants, the Government sought to divert payments being made by University Hospital Health Systems, Inc. ("UH") and Flats East Development, LLC ("Flats East") to the Cleveland International Fund ("CIF"). Later, on March 28, 2012, the Government

1

applied for a seizure warrant for funds that the International Regional Center ("IRC") was obligated to make to the Cleveland Group. Again, however, to understand these search warrant applications, an ever broader review of the background.

Prior to a criminal indictment, CIF was owned in some manner by A. Eddy Zai and/or entities owned and controlled by Zai. Zai was then indicted for bribing a credit union president to improperly provide him with substantial illegitimate loans. Prior to that indictment, CIF was formed as a legal entity in Ohio (established on April 2, 2009 with Ohio's Secretary of State). CIF was designed to operate as an Employment-Based Fifth Preference (EB-5) Regional Center Immigrant Investor Pilot Program, a program overseen by U.S. Citizenship and Immigration Services. At the time of its formation, CIF was owned by The Cleveland Group, a mass of entities that Zai had formed, and Adam Blackman. The Cleveland Group owned 89% of CIF, while Blackman owned 11% of CIF.

As the application for the initial warrants detailed:

> The EB-5 Immigrant Investor Program is an immigration and economic development program of USCIS that allows foreign investors to obtain permanent residency in the United States by making an investment which fosters United States job creation.

After being designated an EB-5 Regional Center on or about January 19, 2010, CIF began identifying potential investors for two commercial projections: 1) construction development with Flats East, and 2) construction development with UH. CIF raised roughly $45 million for Flats East and roughly $60 million for UH. As of January 30, 2012, roughly 160 of the 210 investors had been approved by USCIS. As a result, a total of approximately $80 million had been distributed to Flats East and UH.

The money distributed to Flats East was in conjunction with an agreement reached on May

7, 2010 with CIF.   CIF agreed under the agreement to use EB-5 investor funds to purchase Series A First Mortgage Revenue Bonds from Flats East[1] to support construction of an office tower.   In exchange, CIF would receive a brokerage fee of $100,000 for each $5,000,000 disbursement to Flats East.   At the time of the application, CIF had earned $700,000 in brokerage fees from the Flats East project.

On April 15, 2011 and September 30, 2011, CIF entered into similar agreements with UH.  Under those agreements, CIF agreed to lend UH $60 million for capital improvements.   The parties executed promissory notes under which CIF would receive interest of 2% on the first $50 million and 1.5% on the final $10 million.

The February 24, 2012 warrant applications sought to seize the payments made by Flats East and UH under these agreements.   Specifically, the Government sought and in fact did demonstrate that CIF was funded exclusively with funds that Zai improperly received through his bribery scheme.   As such, the Government argued that any funds generated by CIF were proceeds and properly subject to seizure.

Shortly before these warrant applications, on February 12, 2012, The Cleveland Group sold its entire interest in CIF to International Regional Center ("IRC").[2]   Pursuant to the terms of the sale, IRC issued a promissory note to The Cleveland Group in the amount of $22 million.   At that time, the sole owner of IRC was Adam Blackman, the same Adam Blackman that had begun work for The Cleveland Group in 2004 and was the Group's treasurer in 2008.   After a short period of time away, Blackman had returned and was eventually promoted to COO of CIF.   For the same reasons it sought the proceeds from UH and Flats East, the Government sought and

---

1  CIF was entitled to 8% interest on each of the Series A bonds.
2  Zai had been indicted on February 7, 2012.

3

obtained seizure of the promissory note payments.

On May 4, 2012, the Court held the first of numerous hearings that have ultimately led to the current motion to vacate. The Court began that hearing as follows:

> We're here -- I will paraphrase what appears to be the nature of the request I have before me. In essence, it is the request of the United States Attorney's Office that they be permitted to withdraw certain seizure warrants issued by this court, and they further seek the court's approval of a certain agreement or agreements between the United States Attorney's Office and various named entities, which are set forth in their request, a copy of which we will make part of the record, if it has not already been made part of the record in the case.

The Court then inquired of the Government regarding its prior informal requests to meet with the Court. The Government began its statements by noting that its sought-after-relief was "obviously not a usual request." The Government then laid out its views on why the sought-after-relief was appropriate, but the Government also conceded the lack of authority for such an unusual arrangement:

> And I can't sit here and tell the court, and I wouldn't sit here and tell the court that we have an authority that lets me say to you, you know, "You have the authority to do this. There's precedent for doing this."

In fact, the Government admitted that it could only argue that this Court had authority by way of analogy to other situation, and later noted, "I think the Court is right to say that there's significant differences in those cases [relied on by the Government] from the one before you now."

The Court then pressed further:

> How would that work? First of all, under what authority do you have to do a couple things? With all due respect, I am trying to sort of perhaps learn as we go through this. Under what authority could you come to me and say, having -- the court having issued this seizure warrant, saying, "By the way, Judge, we no longer want those warrants enforced"? Under what authority could you do that?

The response did not rely upon law, but instead purported to rely on "inherent litigating authority."

4

A response the Court could indulge were it not for the express request that the Court become involved in the sought-after-relief. Moreover, the Government conceded that it could not withdraw the warrants without formal Court approval.

The Court then outlined the authority it believed it held, consistent with the statute under which the warrants had been issued. In response, the Government was unable to highlight any statutory authority for approval of its agreement.

The Court then continued that it believed that in some sense of fairness that notice should have been given to Zai before the agreement could be finalized:

> I've granted the warrants. I thought clearly there was probable cause to do so. But in this instance, I question whether or not, in fundamental process, due process doesn't require he be given some notice and an opportunity to at least be heard.

The Government responded to these concerns, indicating that Zai could challenge any forfeiture of his property through a motion for return of property, satisfying his due process rights.

The Court then expressed one of its more pressing concerns regarding the agreement:

> Now, you've addressed it in your brief, but with all due respect, **I have grave concerns about the information set forth in the affidavit of Mr. Blackman's overall role in this matter** for a number of different reasons. I went back and looked at the affidavit, and the affidavit is such that -- I don't want to read it all into the record, but would make one clearly aware --- …
>
> I will not -- I will not read from it, but I will just tell you that it gives me great pause as to Mr. Blackman's role in terms of -- well, his knowledge, information and his potential role when I've already addressed it in the brief…
>
> I'm not being critical, but I am just simply saying to you that I have grave concerns about his overall role and/or knowledge and shall we just say knowledge of the events that gave rise to the indictment in this case, yet to be proven. But based on the information in the affidavit, **I have grave concerns about his role and why he is being -- why he's being permitted to continue on as an integral part of this agreement gives me great pause and great concern**.

The Government then conceded that Blackman's continued involvement had raised concerns with

5

it as well. The Court then continued on, describing in specificity its concerns regarding Blackman's continued involvement.

> Number one, if you look at the statute, 853, and you look at it for yourself, and it says basically, and I will paraphrase, that "No one who is involved directly or indirectly shall be permitted to obtain any interest in the forfeited property." What we're doing here is giving him an interest.
>
> …
>
> And then last, but not least, I have to ask myself, if I am sitting where you are and you are going to be prosecuting this case, is this a benefit to Mr. Blackman to which you should be disclosing to opposing counsel if indeed he's going to be a witness in this case? This may be a benefit under the rule, discovery, you're going have to disclose to counsel for the defendant saying, "Wait a minute."

To this latter concern, the Government conceded that the information would be revealed if Blackman ultimately testified. However, the Court received no satisfactory response when it outlined Blackman's actual knowledge of Zai's underlying crimes as follows:

> He also knows a great deal about the various restructuring, the organizations undertaken by Mr. Zai, and, obviously, the motivation behind them to avoid paying creditors. He obviously knows that they're -- the loans are being made and that there have been no repayments being made on those loans. Again, all I can say is ignoring what should have been obvious. He then does later learn, according to the briefing, he does later learn that there were, in fact, bribes paid. He has all that knowledge.

The Court then continued listing its concerns, including whether CIF's EB-5 certification would be renewed throughout the process and whether appointing a receiver was simply a cleaner approach than the proposed agreements. While these concerns were never fully addressed by any interested party, the parties all continued to stress that the very life of CIF was at issue:

> It's our general feeling that if the agreement isn't approved and if the seizure warrants aren't lifted, that the fund will fail, and that the projects that the fund is supporting will also be put in peril in some respect.

The Court, however, remained skeptical, questioning whether the complexity of the proposed

6

agreement and restructuring agreement were really necessary.

> There is certainly any number of uncertainties in this agreement that would give one pause. So why would we not be better served in some fashion to simply say, if we're going to appoint one, two, three people, I don't care how we do this, and say, "Your task and your job will be to run CIF while this case is pending, until such time as the proceedings against Mr. Zai are resolved one way or the other"? Why not simply, again, do something of that nature that would be much simpler, much easier to manage? That's my question.

The Court's inquiry was met with the assertion that the complexity of the agreements was a result of trying to somehow placate concerns raised by the Government. However, no counsel was able to explain how the agreement with the Government and the restructuring agreement somehow moved the matter forward in an expeditious manner.

The Court also expressed concern over just how many contingencies were contained in the agreement, including the inability at that time to firmly name the civic entity that would ultimately have an ownership interest in CIF. In that same vein, the Court expressed its concern over the massive potential conflicts of interest that could arise from any new owners given the scope of the projects undertaken by CIF and the future projects sought by CIF. It was the Court's view and has remained the Court's view that a significant conflict of interest policy would be required to facilitate any of the agreements going forward.

In the face of all of the concerns put forth by the Court, the parties returned again and again to their assertion that CIF would fail in its entirety if the seizure warrants remained in place. The Government, employees of CIF, and Peter Raskind all opined that the seizure warrants would drive new investors away and likely cause current investors awaiting USCIS approval to withdraw their funds as well.[3] With this backdrop in place, the Court issued its order withdrawing the

---

3 While the Government appears to have relied upon Raskind as an expert, he never produced a written report of any kind to the Government or the Court.

7

seizure warrants.

**The Agreements**

However, the parties' repeated assertions that this Court "approved" their agreements is somewhat misleading. After considering the totality of the arguments put forth by the parties, the Court issued a two-page order. The Court ordered as follows:

> Upon application of the parties and in accordance with that agreement, attached hereto as Exhibit 1, the seizure warrants in 5:12MJ1018 and 5:12MC1019 are HEREBY WITHDRAWN.
>
> This ORDER and the attached agreement shall remain in full force and effect through the criminal proceedings in Case No. 1:12CR71. Moreover, **this order and the agreement are subject to modification and/or termination by future order of the Court**. Furthermore, the Court expressly reserves the right to modify and/or terminate this order and/or the agreement when it rules upon Defendant A. Eddy Zai's motion for return of property in Case No. 1:12CR71. (emphasis added).

Thus, far from adopting or approving the parties' agreement, the Court simply granted the Government's request to withdraw the seizure warrants. In so doing, the Court attached the parties' agreement to facilitate public access and review. To be clear, at no time did the Court ever formally approve the agreement, nor did the Court ever become a signatory to the agreement. Instead, having raised so many distinct concerns, the Court expressly, **in clear and unambiguous language**, reserved the right to modify the agreement and the restructuring agreement.

For ease of reference, the Court notes the following pertinent details of the agreement between CIF and the Government. From April 1 through September 30, 2012, CIF would only be required to pay into escrow 15% of the monthly payments from UH and Flats East. Thereafter, CIF would pay into escrow 70% of these monthly payments. In exchange for allowing CIF to receive a portion of these payments, the Government gained a 20% interest in two, possible future projects that CIF was pursuing, the Westin project and the American Greetings project. It is

8

through receipt of these funds from future projects that the Government projects an ability to recover more than the $12 million available solely from the two existing projects.

In addition to the agreement with the Government, CIF also submitted its restructuring agreement. This agreement provided that Blackman would transfer a portion of his ownership interest to Steve Strnisha a later-identified civic entity. Blackman and Strnisha would each own 40% of the business and the civic entity would own 20% of the business. At that time, the parties contemplated that Cleveland Development Advisers would ultimately become that civic entity. The restructuring agreement also contained provisions for retaining certain CIF employees and continuing their salaries. The restructuring agreement also called for the creation of a five-person board of directors to run CIF. Within that agreement, the parties agreed that any conflict of interest would require non-participation by that board member and that a positive vote on that matter would require immediate resignation from the board of the conflicted member.

The restructuring agreement also contained the following:

> 3. Court Appointed Special Master. The Court has appointed [ _____ -...] to serve as a special master (the "Special Master") of the compliance by CIF, Blackman and Strnisha with the terms and conditions of this Amended Restructuring Agreement and of the USAO Agreement. The fees of the Special Master shall be paid by CIF. CIF shall deliver to the Special Master, all on a confidential basis, financial reports prepared by CIF and/or its outside auditors. CIF shall also give the Special Master full and unlimited access to all of its books and records, including CIF's personnel and employment information and contracts, all of which shall be provided to the Special Master on a confidential basis. The Special Master shall be noticed of all board meetings and shall have the right to observe all board meetings. On a confidential basis, the Special Master shall may share all information with the US Attorney's Office and, not less frequently than once every month following the date of this Amended Restructuring Agreement, the Special Master shall prepare and deliver to the Court and the U.S. Attorney's Office, on a confidential basis, a written report on the status of CIF's business and its compliance with the terms and conditions of this Amended Restructuring Agreement and the USAO Agreement. Provided that the Special Master confirms full compliance with such Agreements, the engagement of the Special Master shall end upon the termination of this

Amended Restructuring Agreement, as set forth in Section 8 below. In that respect, Section 8 provides that the agreement would terminate at the latest of several events. It is undisputed that the list contains a reference to final judgment in the Zai criminal matter. The final judgment in that matter has not yet occurred, compelling the conclusion that the restructuring agreement remains in full force and effect.

**Modifying the Agreement**

Shortly after approving the agreement, the Court began receiving monthly reports from the initial special master, Peter Raskind.[4] Initially, those reports only served to demonstrate the validity of many of the concerns raised by Court. Despite withdrawal of the seizure warrants on May 25, 2012, by July 11, 2012, the restructuring agreement still remained filled with open-ended contingencies. The civic entity, Cleveland Development Advisers, had still not fully committed to becoming a partial owner. In fact, at that time, Mr. Raskind believed that consummating the transaction by the end of July was optimistic, at best.

Much more importantly, the Court quickly learned that its effort to maintain oversight over CIF was not being completely fulfilled. Instead, in stark contrast to the Court's requests, CIF continued to operate as if it were not under Court oversight. Despite written promises within the agreements that no changes would occur, Mr. Raskind quickly came to the Court with proposed, fundamental alterations to the agreements. For example, CIF proposed to alter the agreed-upon conflict of interest policy, believing it to be overly restrictive. This proposal was made **despite** the repeated concerns expressed by the Court over and again regarding conflicts. The Court declined to allow such a modification and instructed the parties to develop a comprehensive

---

4 It is the Court's understanding that Mr. Raskind served in a volunteer, unpaid capacity during his time as the initial special master herein.

conflict of interest policy. The parties failed to produce such a policy.

As the matter progressed, it became clear to the Court that the oversight allowed by the parties' agreements was not being utilized. While the Government had the right to access certain documents and even audit the entity, none of these rights were exercised. Moreover, it became clear that Mr. Raskind was provided information upon request, but it was not as though the business was opened up to him. Instead, he was also kept on the fringe of the business.

This lack of oversight was particularly troubling for several reasons. First, the parties had **expressly** agreed to the appointment of a special master. However, his role became very limited and his authority was minimal, despite the language quoted above. Additionally, the Court has been informed over and again of the stakes of this matter. If CIF can remain successful, the victim of Zai's crimes may recover close to $24 million. If CIF fails, the victim's recovery could be limited to closer to $12 million. At the same time, the Government has been unwavering in its position – the entirety of the seized funds are proceeds of Zai's crimes and subject to forfeiture. Thus, CIF is being propped up by funds that are subject to forfeiture. It is this very fact that has *mandated* the Court's involvement. However, despite Court involvement, CIF appears to have continued under the belief that it would conduct business as usual. This is not the case. If CIF seeks to continue to reap the benefit of its agreement with the Government, it must also recognize the extent to which it must answer to the Court.

**Motion to Vacate**

In this final regard, the Court holds as follows. The motion to vacate is GRANTED. The prior agreements shall go back into force and effect as of the day of this order, subject to possible final approval of the Court at a later date. However, that is not to say that the Court has found

merit in the arguments raised by CIF in its motion to vacate. Rather, as detailed above, any interest CIF has in the funds at issue was granted solely through the discretion of this Court and the Court expressly reserved the right to modify the agreements. Moreover, as detailed above, the utter lack of ongoing oversight of the funds at issue compelled the Court to modify the agreements. Thus, it was CIF's conduct that led to the modification. Nothing in their motion supports vacating the award.

**Successor Special Master**

However, during the hearing on the motion to vacate, the Court informed the parties that it would appoint a successor special master with broader powers than the prior special master, Mr. Raskind. The Court then inquired of the parties regarding their consent to such a special master. The Government and the victim, NCUA, readily agreed to the appointment of the special master with broader authority. CIF reserved the right to consider the issue and raise a later objection. CIF then raised its objections. Once again, CIF did not contest the Court's authority to appoint a special master. Indeed, having previously agreed to the appointment of a special master, CIF has no grounds to object to the appointment itself as the restructuring agreement remains in full force and effect.

The Court notes its reliance on Fed. R. Civ. P. 53 that allows the Court to appoint a special master to "perform duties consented to by the parties" or for some "exceptional condition." Moreover, the Court would also note that 21 U.S.C. § 853(e) allows the Court to "take any other action" necessary "to preserve the availability" of property subject to forfeiture. In the Court's view, the overlap of these two issues herein grants the authority to appoint the special master with

the powers specified.[5]

First, the Court finds this to be an exceptional condition. As outlined above, no one representing any of the entities and persons involved could identify a case in which this type of agreement had been reached. The Court's extensive research yielded no case in which assets allegedly subject to forfeiture had been allowed to flow to an entity to essentially keep that entity viable. Beyond this fact, there remains the fact that CIF's continued viability remains the difference between victim recovery of $12 million and victim recovery of $24 million. Those facts coupled together present an exceptional condition.

However, even if those facts did not create an exceptional condition, the Court finds that the appointment of a special master with day-to-day authority is compelled by 21 U.S.C. § 853. In that regard, the Court is charged with protecting assets which may ultimately be subject to forfeiture. As detailed above, CIF appears to have only given lip-service to the Court's concerns regarding conflicts of interest. Moreover, the Government conceded that it had not utilized a **single** one of its rights to examine the assets of CIF. At the same time, the Court has witnessed firsthand the amount of money invested by CIF into items such as attorney fees, while having little to no knowledge of the funds expended on CIF's core business projects. Time and again, counsel for CIF has contacted the Court, proposed alterations, attended hearings, and generally sought to complicate this matter far beyond what is necessary. Thus, in summary, while the Court has allowed victim's funds to be currently diverted in the hopes of larger long-term recovery, it has been given no meaningful mechanism for ensuring that those funds are properly utilized to meet that long-term goal.

---

5 Again, as the parties have agreed in writing to the appointment of a special master, the Court cites this authority while not holding that it *must* rely on it as the parties' consent is also sufficient.

13

The Court's responsibility herein compels closer oversight of CIF. If CIF fails in the short term, it will have wasted funds that should have been available to the victim, the NCUA. Of course, without closer oversight, the Court has absolutely no way of determining whether CIF is currently properly utilizing the funds it gained through an agreement with the Government. To date, no other mechanism has succeeded in making CIF's business transparent to the Court. Accordingly, CIF's objections to the scope of the appointment are OVERRULED.

In overruling the objections, the Court summarizes as follows: 1) CIF consented to the appointment of a special master from the outset of this matter, 2) CIF is receiving assets for which the Government sought and received seizure warrants, 3) to date, nothing has convinced the Court that those assets are not subject to forfeiture, but the Court recognizes that CIF has filed a third-party claim in the forfeiture action, 4) all prior attempts at oversight of CIF have been lacking, and 5) there is nearly $10 million in victim recovery at issue.

**CIF's Alternative Proposal**

Moreover, in overruling the objections, the Court is cognizant of CIF's proposal to allow the successor special master more direct access to its records and decision-making process. Further, the Court recognizes CIF's contention that the appointment of the special master with the duties envisioned by the Court may require CIF to return to USCIS for recertification. The Court responds to these concerns as follows.

First, after Zai was indicted and transferred his ownership interest to Blackman and the other entities, CIF was recertified. This came despite the background that included Blackman having worked closely with Zai during the time frame for which Zai was indicted for criminal activity. Thus, the Court has little concern that recertification will occur following the

14

appointment of the special master. The Court would note as well that this is a successor special master, so it is not entirely clear that expanding the scope of his authority would necessitate recertification, but the Court does not believe this to be a significant hurdle in any event.

The Court is also cognizant of the claim that the delay occasioned by seeking recertification could be fatal to CIF. Again, the Court finds these concerns to be overstated. CIF has survived Zai's indictment, a significant restructuring of its ownership, the three seizure warrants, and the initial appointment of a special master. CIF has contemplated through its agreement even further restructuring. Further, while CIF contends that these financial woes will occur, it has had no difficulty in paying counsel to contest and seek to alter or amend every document created in this matter. Thus, the premise that the appointment of a special master will lead to CIF's demise is dramatically overstated in the Court's view.

Finally, CIF's offer to allow the successor special master more access to its records offers the Court little solace. The initial special master similarly had this right of access, as did the Government -- neither appeared to make use of the right of access. Moreover, neither is charged like the Court with protecting victim recovery. Additionally, while CIF agreed to make no changes during the pendency of the agreement without prior Government approval, it still continued to proffer changes to the special master and the Court without having gained such approval. In that regard, the proffered changes sought to weaken the conflict of interest policy agreed upon to ensure that the victim's funds were properly shepherded by CIF. Thus, CIF's suggestion that *this time* it would allow meaningful access rings hollow given its track record.

The motion to vacate is GRANTED. The prior agreement shall remain in effect until future order of this Court, once again allowing a percentage of funds to flow to CIF. CIF's

objections to the scope of the special master's duties are OVERRULED.  The Court's appointment of the special master and his duties shall remain in effect absent future order from this Court.

IT IS SO ORDERED.

Date:   January 17, 2013              /s/ John R. Adams
                                                                    JUDGE JOHN R. ADAMS
                                                                    UNITED STATES DISTRICT JUDGE